UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ISLAND INTELLECTUAL PROPERTY LLC, LIDS CAPITAL LLC, DOUBLE ROCK CORPORATION, and INTRASWEEP LLC,<br><br>               Plaintiffs,<br><br>v.<br><br>PROMONTORY INTERFINANCIAL NETWORK, LLC, MBSC SECURITIES CORPORATION, DEUTSCHE BANK AG, DEUTSCHE BANK TRUST COMPANY AMERICAS, and TOTAL BANK SOLUTIONS, LLC,<br><br>               Defendants. | 09-CV-2675 (VM)<br><br><br><br>ANSWER AND COUNTERCLAIMS |

## ANSWER OF DEFENDANT PROMONTORY INTERFINANCIAL NETWORK, LLC

Defendant Promontory Interfinancial Network, LLC ("Promontory"), by its attorneys Mayer Brown LLP, for its Answer and Counterclaims in response to the Consolidated First Amended Complaint of Island Intellectual Property LLC ("Island IP"), LIDs Capital LLC ("LIDs Capital"), Double Rock Corporation, which was previously known as Reserve Management Corporation ("the Reserve" or "Reserve Management"), and Intrasweep LLC ("Intrasweep") (collectively, the "Reserve Parties"), dated June 11, 2009 ("Amended Complaint"), alleges as follows:

1.      Paragraph 1 of the Amended Complaint purports to contain a description of the action, to which no response is required. To the extent that Paragraph 1 of the Amended Complaint requires an answer, Promontory denies the allegations contained therein.

2.      Paragraph 2 of the Amended Complaint purports to contain a description of The Reserve Parties' claims, to which no answer is required.  To the extent that Paragraph 2 of the Amended Complaint requires an answer, Promontory denies the allegations contained therein.

3.      Paragraph 3 of the Amended Complaint alleges that "true and correct" copies of certain patents are attached to the Amended Complaint, to which no response is required.  To the extent that Paragraph 3 of the Amended Complaint requires an answer, Promontory denies the allegations contained therein.

<u>THE PARTIES</u>

4.      States that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 4 of the Amended Complaint.

5.      States that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 5 of the Amended Complaint.

6.      States that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 6 of the Amended Complaint.

7.      States that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 7 of the Amended Complaint.

8.      Admits the allegations contained in Paragraph 8 of the Amended Complaint.

9.      States that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 9 of the Amended Complaint.

10.     States that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 10 of the Amended Complaint.

11.     States that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 11 of the Amended Complaint.

12.     States that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 12 of the Amended Complaint.

<u>JURISDICTION AND VENUE</u>

13.     Paragraph 13 of the Amended Complaint is a statement of jurisdiction to which no answer is required.  To the extent that Paragraph 13 of the Amended Complaint requires an answer, Promontory denies the allegations contained therein.

14.     Paragraph 14 of the Amended Complaint is a statement of jurisdiction to which no answer is required.  To the extent that Paragraph 14 of the Amended Complaint requires an answer, Promontory denies the allegations contained therein.

15.     Admits that this Court has personal jurisdiction over it for the purposes of this action and denies the remaining allegations contained in Paragraph 15 of the Amended Complaint.

16.     States that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 16 of the Amended Complaint.

17.     States that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 17 of the Amended Complaint.

18.     States that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 18 of the Amended Complaint.

19.     States that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 19 of the Amended Complaint.

20.     Paragraph 20 is a statement of venue to which no answer is required.  To the extent that Paragraph 20 of the Amended Complaint requires an answer, Promontory denies the allegations contained therein.

FACTUAL BACKGROUND

21.    Denies the allegations contained in Paragraph 21 of the Amended Complaint.

22.    Denies the allegations contained in Paragraph 22 of the Amended Complaint.

23.    Denies the allegations contained in Paragraph 23 of the Amended Complaint.

24.    Denies the allegations contained in Paragraph 24 of the Amended Complaint.

25.    Denies the allegations contained in Paragraph 25 of the Amended Complaint.

26.    Denies the allegations contained in Paragraph 26 of the Amended Complaint.

27.    Denies the allegations contained in Paragraph 27 of the Amended Complaint.

28.    Denies the allegations contained in Paragraph 28 of the Amended Complaint.

THE PATENTS-IN-SUIT

29.    Denies the allegations of Paragraph 29 of the Amended Complaint and refers to the published specifications and claims of the U.S. Patent No. 7,509,286 for its precise content.

30.    Denies the allegations of Paragraph 30 of the Amended Complaint and refers to the published specifications and claims of the U.S. Patent No. 7,519,551 for its precise content.

31.    Denies the allegations of Paragraph 31 of the Amended Complaint and refers to the published specifications and claims of the U.S. Patent No. 7,536,350 for its precise content.

32.    States that it lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in Paragraph 32 of the Amended Complaint.

33.    States that it lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in Paragraph 33 of the Amended Complaint.

34.    States that it lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in Paragraph 34 of the Amended Complaint.

35.    States that it lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in Paragraph 35 of the Amended Complaint.

## THE PROMONTORY AND DREYFUS INFRINGING PRODUCTS

36.    Denies the allegations contained in Paragraph 36 of the Amended Complaint.

37.    States that it lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in Paragraph 37 of the Amended Complaint.

38.    Denies the allegations contained in Paragraph 38 of the Amended Complaint.

39.    Denies the allegations contained in Paragraph 39 of the Amended Complaint.

40.    Denies the allegations contained in Paragraph 40 of the Amended Complaint.

41.    Denies the allegations contained in Paragraph 41 of the Amended Complaint.

42.    Denies the allegations contained in Paragraph 42 of the Amended Complaint.

43.    Denies the allegations contained in Paragraph 43 of the Amended Complaint.

## THE DEUTSCHE DEFENDANTS' INFRINGING PRODUCTS

44.    States that it lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in Paragraph 44 of the Amended Complaint.

45.    States that it lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in Paragraph 45 of the Amended Complaint.

46.    States that it lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in Paragraph 46 of the Amended Complaint.

47.    States that it lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in Paragraph 47 of the Amended Complaint.

48.    States that it lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in Paragraph 48 of the Amended Complaint.

49.    States that it lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in Paragraph 49 of the Amended Complaint.

50.    States that it lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in Paragraph 50 of the Amended Complaint.

51.    States that it lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in Paragraph 51 of the Amended Complaint.

52.    States that it lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in Paragraph 52 of the Amended Complaint.

<u>COUNT ONE</u>

53.    Incorporates the foregoing Paragraphs 1 through 52 by reference as if set forth fully herein.

54.    Denies the allegations contained in Paragraph 54 of the Amended Complaint.

55.    Denies the allegations contained in Paragraph 55 of the Amended Complaint.

56.    Denies the allegations contained in Paragraph 56 of the Amended Complaint.

57.    Denies the allegations contained in Paragraph 57 of the Amended Complaint.

<u>COUNT TWO</u>

58.    Incorporates the foregoing Paragraphs 1 through 57 by reference as if set forth fully herein.

59.    The allegations contained in Paragraph 59 of the Amended Complaint relate to Deutsche Bank AG, Deutsche Bank Trust Company, and Total Bank Solutions, LLC (together, "the Deutsche Defendants") and therefore do not require an answer.  To the extent the allegations contained in Paragraph 59 of the Amended Complaint purport to relate to Promontory, such allegations are denied.

60.    The allegations contained in Paragraph 60 of the Amended Complaint relate to the Deutsche Defendants and therefore do not require an answer.  To the extent the allegations contained Paragraph 60 of the Amended Complaint purport to relate to Promontory, such allegations are denied.

61.    The allegations contained in Paragraph 61 of the Amended Complaint relate to the Deutsche Defendants and therefore do not require an answer.  To the extent the allegations contained in Paragraph 61 of the Amended Complaint purport to relate to Promontory, such allegations are denied.

62.    The allegations contained in Paragraph 62 of the Amended Complaint relate to the Deutsche Defendants and therefore do not require an answer.  To the extent the allegations contained in Paragraph 62 of the Amended Complaint purport to relate to Promontory, such allegations are denied.

<u>COUNT THREE</u>

63.    Incorporates the foregoing Paragraphs 1 through 62 by reference as if set forth fully herein.

64.    Denies the allegations contained in Paragraph 64 of the Amended Complaint.

65.    Denies the allegations contained in Paragraph 65 of the Amended Complaint.

66.    Denies the allegations contained in Paragraph 66 of the Amended Complaint.

67.    Denies the allegations contained in Paragraph 67 of the Amended Complaint.

68.    Denies the allegations contained in Paragraph 68 of the Amended Complaint.

<u>COUNT FOUR</u>

69.    Incorporates the foregoing Paragraphs 1 through 68 by reference as if set forth fully herein.

70.     The allegations contained in Paragraph 70 of the Amended Complaint relate to the Deutsche Defendants and therefore do not require an answer.  To the extent the allegations contained in Paragraph 70 of the Amended Complaint purport to relate to Promontory, such allegations are denied.

71.     The allegations contained in Paragraph 71 of the Amended Complaint relate to the Deutsche Defendants and therefore do not require an answer.  To the extent the allegations contained in Paragraph 71 of the Amended Complaint purport to relate to Promontory, such allegations are denied.

72.     The allegations contained in Paragraph 72 of the Amended Complaint relate to the Deutsche Defendants and therefore do not require an answer.  To the extent the allegations contained in Paragraph 72 of the Amended Complaint purport to relate to Promontory, such allegations are denied.

73.     The allegations contained in Paragraph 73 of the Amended Complaint relate to the Deutsche Defendants and therefore do not require an answer.  To the extent the allegations contained in Paragraph 73 of the Amended Complaint purport to relate to Promontory, such allegations are denied.

74.     The allegations contained in Paragraph 74 of the Amended Complaint relate to the Deutsche Defendants and therefore do not require an answer.  To the extent the allegations contained in Paragraph 74 of the Amended Complaint purport to relate to Promontory, such allegations are denied.

<u>COUNT FIVE</u>

75.     Incorporates the foregoing Paragraphs 1 through 74 by reference as if set forth fully herein.

8

76.     The allegations contained in Paragraph 76 of the Amended Complaint relate to the Deutsche Defendants and therefore do not require an answer.  To the extent the allegations contained in Paragraph 76 of the Amended Complaint purport to relate to Promontory, such allegations are denied.

77.     The allegations contained in Paragraph 77 of the Amended Complaint relate to the Deutsche Defendants and therefore do not require an answer.  To the extent the allegations contained in Paragraph 77 of the Amended Complaint purport to relate to Promontory, such allegations are denied.

78.     The allegations contained in Paragraph 78 of the Amended Complaint relate to the Deutsche Defendants and therefore do not require an answer.  To the extent the allegations contained in Paragraph 78 of the Amended Complaint purport to relate to Promontory, such allegations are denied.

79.     The allegations contained in Paragraph 79 of the Amended Complaint relate to the Deutsche Defendants and therefore do not require an answer.  To the extent the allegations contained in Paragraph 79 of the Amended Complaint purport to relate to Promontory, such allegations are denied.

## PRAYER FOR RELIEF

80.     Denies that the Reserve Parties are entitled to any or all of the relief requested or to any other relief.

## AFFIRMATIVE DEFENSES

### First Affirmative Defense

81.     The Amended Complaint, and each cause of action and claim for relief alleged therein, fails to state a claim upon which relief can be granted.

### Second Affirmative Defense

82.    Plaintiffs' claims are barred, in whole or in part, by the doctrine of unclean hands.

### Third Affirmative Defense

83.    Plaintiffs' claims are barred, in whole or in part, by Plaintiffs' failure to mitigate its damages, if any.

### Fourth Affirmative Defense

84.    Plaintiffs' claims are barred, in whole or in part, by the doctrines of waiver, estoppel, and/or acquiescence.

### Fifth Affirmative Defense

85.    Promontory has not infringed, directly or indirectly, any valid claim of the '231 patent, the '286 patent, or the '551 patent.

### Sixth Affirmative Defense

86.    Each and every claim of the '286 patent is invalid under one or more of the provisions of Title 35 of the United States Code, including without limitation one or more of 35 U.S.C. §§ 101, 102, 103, 112, 116, and 135.

### Seventh Affirmative Defense

87.    Each and every claim of the '551 patent is invalid under one or more of the provisions of Title 35 of the United States Code, including without limitation one or more of 35 U.S.C. §§ 101, 102, 103, 112, 116, and 135.

### Eighth Affirmative Defense

88.    The '286 patent is unenforceable because one or more persons involved in the prosecution of the application that led to the '286 patent or applications related to the '286 patent committed inequitable conduct.

**Ninth Affirmative Defense**

89.     The '551 patent is unenforceable because one or more persons involved in the prosecution of the application that led to the '551 patent or applications related to the '551 patent committed inequitable conduct.

## NATURE OF THE COUNTERCLAIMS

Promontory, for its counterclaims, alleges as follows:

90.     Promontory and the Reserve compete in the market for providing "deposit sweep services" to broker-dealers.  In a deposit sweep service, cash held in customer accounts at broker-dealers is transferred electronically ("swept") into federally-insured and interest-bearing deposit accounts until the cash is needed by the customer.  Financial institutions have offered such services to their customers since at least the early 1980s.  Nonetheless, more than ten years later in the late 1990s, the Reserve began filing United States patent applications purporting to claim methods and systems for providing deposit sweep services that are indistinguishable from these earlier services.  The methods and systems claimed by the Reserve were well-known when it filed its applications:  the "invention" the Reserve sought to patent involves nothing more than the application of longstanding legal principles found in banking statutes, regulations, and court decisions.

91.     Knowing that deposit sweep services offered years before would likely prevent it from obtaining any issued patents, the Reserve, and more recently, Island IP, intentionally concealed from and misrepresented to the United States Patent and Trademark Office ("PTO") material information about these earlier services during the prosecution of its patent applications.  The Reserve also intentionally concealed from and misrepresented to the PTO material information about the Reserve's own deposit sweep service -- including that it was offered for sale more than one year prior to the first Reserve patent application.  As a result of these

11

concealments and misrepresentations, three of the applications filed by the Reserve have now

issued as United States Patents Nos. 6,374,231 ("the '231 patent"), 7,509,286 ("the '286

patent"), and 7,519,551 ("the '551 patent") (collectively, "the Reserve Patents"). Upon

information and belief, the Reserve assigned its rights to the Reserve Patents and related patent

applications to Island IP, a wholly owned subsidiary of the Reserve, in December 2008.

92.     Promontory offers its customers a deposit sweep service that works in a

fundamentally different way than the Reserve's deposit sweep service and the methods and

systems that are the subject of the Reserve Patents and related patent applications. The Reserve

Parties know or should know that Promontory's service is not covered by these patents and

applications and that the Reserve Patents and related patent applications are invalid and

unenforceable. Yet the Reserve has falsely stated to Promontory's customers and service

providers that Promontory's deposit sweep service practices the Reserve Patents and related

applications and that Promontory's customers and service providers may incur liability for patent

infringement. This improper and malicious conduct by the Reserve has harmed Promontory's

business and reputation and has caused Promontory to lose substantial potential revenue.

93.     Since as early as 2006, the Reserve Parties have been asserting that Promontory

was infringing the Reserve Patents and related patent applications. Most recently, in a letter to

Promontory's counsel dated March 10, 2009, the Reserve Parties reiterated their allegation that

Promontory was wrongly using the purported inventions claimed in the '231 patent, the

applications for the '286 patent, and the '551 patent, as well as pending related patent

applications, reciting

> [Y]our June 30, 2006 letter which categorically denied Promontory's use of the claimed
> invention and incorrectly asserted that the '231 Patent and the pending patent applications
> "circumvent, if not violate, federal regulatory requirements." Your client, or at least its
> banking counsel, should have realized that both of these assertions were untrue. [...]

Since that time, your client's willful misappropriation of Double Rock's inventions to compete with Double Rock has resulted in substantial harm to Double Rock, including the loss of several clients, and has eroded Double Rock's profits on the products it has been able to sell.

94.     Accordingly, a substantial, immediate, and real controversy exists between Promontory and the Reserve Parties that can be fully resolved in this action, and therefore, Promontory brings claims under federal law to declare the Reserve Patents invalid, unenforceable, and not infringed, and under federal and state law to address the Reserve's unfair competition and its false statements to Promontory's customers and service providers. Promontory seeks declaratory and injunctive relief, compensatory damages, attorney's fees, and costs.

## JURISDICTION AND VENUE

95.     This Court has subject matter jurisdiction over Promontory's declaratory judgment claims (Counterclaims I - IX) pursuant to 28 U.S.C. §§ 1331 and 1338(a), because they present a federal question arising under Title 35 of the United States Code, and pursuant to 28 U.S.C. §§ 2201 and 2202, because an actual controversy exists as to the invalidity, enforceability, and infringement of the Reserve Patents. This Court has supplemental subject matter jurisdiction over Promontory's state law claims (Counterclaims X - XI) pursuant to 28 U.S.C. § 1367(a). This Court has subject matter jurisdiction over Promontory's unfair competition claim arising under the Lanham Act, 15 U.S.C. § 1125(a) (Counterclaim XII) pursuant to 28 U.S.C. § 1331. This Court also has subject matter jurisdiction over Promontory's state and federal law unfair competition claims (Counterclaims X - XII) pursuant to 28 U.S.C. § 1338(b), because they are joined with substantial and related claims under the patent laws.

96.     Venue in this Court is proper pursuant to 28 U.S.C. § 1391(b), because the Reserve Parties reside in this judicial district and because the Reserve Parties sought transfer of this action to this judicial district.

97.     This Court has personal jurisdiction over the Reserve Parties, because, upon information and belief: (i) the Reserve Parties have contracted to supply services or things in this State; (ii) the Reserve Parties have caused tortious injury in this State by an act or omission outside this State; and (iii) the Reserve Parties regularly do or solicit business, and engage in other persistent courses of conduct, and derive substantial revenue from goods used or consumed or services rendered, in this State.  The Reserve Parties have also consented to personal jurisdiction in this Court by filing the underlying action and by moving to transfer actions filed by Promontory in the Eastern District of Virginia to this Court.

## PARTIES

98.     Defendant and counterclaim plaintiff Promontory is a Delaware limited liability company with its principal place of business at 1515 N. Courthouse Road, Arlington, Virginia 22201.  Promontory was founded in 2002 by banking-industry leaders, including a former Comptroller of the Currency, Vice Chairman of the Federal Reserve Board, and Chief of Staff of the Federal Deposit Insurance Corporation ("FDIC").  Promontory provides services to the financial services industry, including, among other things, deposit sweep services for broker-dealers.

99.     Upon information and belief, Plaintiff and counterclaim defendant the Reserve, is a New Jersey corporation with its principal place of business at 1250 Broadway, New York, New York 10001.  The Reserve is a direct competitor of Promontory in the market for deposit sweep services.  Upon information and belief, the Reserve is the sublicensee of LIDs Capital for the

'551 patent with respect to providing cash management services for broker dealers and asset managers.

100.    Upon information and belief, Plaintiff and counterclaim defendant Island IP, which is a wholly-owned, patent-holding subsidiary of the Reserve, is a Delaware limited liability company with its principal place of business at 1250 Broadway, New York, New York 10001.  Upon information and belief, the Reserve assigned all rights to the Reserve Patents and related patent applications to Island IP in December 2008.  Upon information and belief, throughout the existence of Island IP, Plaintiff Island IP has been controlled by the Reserve, and Plaintiffs Island IP and the Reserve have acted through the same agents and been represented by the same counsel.

101.    Upon information and belief, Plaintiff and counterclaim defendant LIDs Capital, which is a wholly-owned subsidiary of the Reserve, is a limited liability corporation organized and existing under the laws of Delaware with its principal place of business at 1250 Broadway, New York, New York 10001.  Upon information and belief, LIDs Capital is the exclusive licensee of the '231 and '286 patents and related patent applications, and the '551 patent with respect to providing cash management services for broker dealers and asset managers.  Upon information and belief, throughout the existence of LIDs Capital, Plaintiff LIDs Capital has been controlled by the Reserve, and Plaintiffs LIDs Capital and the Reserve have acted through the same agents and been represented by the same counsel.

102.    Upon information and belief, Plaintiff and counterclaim defendant Intrasweep, which is a wholly-owned subsidiary of the Reserve, is a limited liability company organized and existing under the laws of Delaware with its principal place of business at 1250 Broadway, New York, New York 10001.  Upon information and belief, Intrasweep is the exclusive licensee of

Island IP for the '551 patent with respect to providing cash management services for banks in connection with money market deposit accounts and demand deposit accounts that facilitate the transfer of funds between money market deposit accounts and demand deposit accounts. Upon information and belief, throughout the existence of Intrasweep, Plaintiff Intrasweep has been controlled by the Reserve, and Plaintiffs Intrasweep and the Reserve have acted through the same agents and been represented by the same counsel.

## FACTUAL BACKGROUND

### Deposit Sweep Services

103.    Broker-dealer customers commonly hold uninvested or "excess" cash in their brokerage accounts. The excess cash held in a brokerage account may result from interest or dividend payments on securities, the sale of securities, or a deposit of cash by the customer. Under SEC regulations, a broker-dealer is not required to pay interest on such excess cash.

104.    As a service to their customers, many broker-dealers will automatically invest, or "sweep," the excess cash in a customer's brokerage account into a liquid investment, such as a money market mutual fund or a bank deposit account. Broker-dealers may also offer cash management features on the brokerage account, allowing the customer to write checks, make debit card transactions, and make ATM withdrawals against the cash in the brokerage account. When a customer uses the cash management feature to make such a transaction, the broker-dealer withdraws funds from the money market fund or deposit account to satisfy the debits incurred by the customer.

105.    Many broker-dealers that provide sweeps of excess cash offer their customers the option to sweep cash into a deposit account at a bank whose accounts are insured by the FDIC (hereinafter, "a deposit sweep arrangement"). In a typical deposit sweep arrangement, such as those supported by Promontory, on each business day the broker-dealer sweeps excess cash from

the brokerage accounts into the deposit accounts and transfers funds back into the brokerage accounts that are necessary to satisfy any withdrawals or transactions by the broker-dealer's customers (*e.g.*, check or debit card transactions).

106.   In many deposit sweep arrangements, including those supported by Promontory, the cash is swept from the brokerage accounts to deposit accounts at one or more banks.  Federal banking laws and regulations do not require banks to hold cash reserves against certain deposit accounts, such as Money Market Deposit Accounts ("MMDAs"), so long as depositors are prohibited from making more than six transfers or withdrawals in a month, no more than three of which may be withdrawals by check or debit card, subject to certain exceptions.

107.   A deposit sweep arrangement allows a broker-dealer customer to earn interest and obtain FDIC insurance on cash that is not immediately needed and that, if kept in the brokerage account, may not generate interest or obtain FDIC insurance.  By using properly designed deposit sweep arrangements, customers can make unlimited transactions, including check and debit card transactions, from their brokerage accounts, while earning interest and/or obtaining FDIC insurance.

108.   Some broker-dealers sweep customer funds into MMDAs at multiple banks.  This permits the broker-dealer to offer customers FDIC insurance on their deposits in excess of the limit imposed upon a single depositor at a single bank, which is presently $250,000.

109.   Broker-dealers benefit from deposit sweep arrangements because the broker-dealers are typically paid a fee based on a percentage of the deposits placed with the bank.

110.   A deposit sweep arrangement also benefits banks that hold swept funds because the arrangement provides such banks with a relatively large, long-term, and stable source of deposits.  Further, by complying with the limits on the number of withdrawals or transfers that

can be made in a month from an MMDA, such banks generally are not required to hold cash reserves on the swept funds while they are held in an MMDA.

111.    Service providers in the deposit sweep services market, such as Promontory, enter into agreements with broker-dealers to provide processing services in connection with a deposit sweep arrangement, and with banks to accept swept funds into deposit accounts. These service providers, including Promontory, typically receive a fee from the banks for their services.

112.    Upon information and belief, the first deposit sweep service was developed and offered by Merrill Lynch, Pierce, Fenner & Smith ("Merrill Lynch"). As a broker-dealer, Merrill Lynch offered this service to its brokerage customers at least as early as 1983 as a feature of Merrill Lynch's Cash Management Account ("CMA"), a brokerage account with cash management features. Merrill Lynch called this feature the Insured Savings Account ("ISA") (collectively, "Original 1983 CMA/ISA Service").

113.    Since Merrill Lynch introduced the Original 1983 CMA/ISA Service, many broker-dealers and banks have offered similar deposit sweep services to their customers. Such services were offered well before the Reserve Parties made any applications with the PTO for the Reserve Patents.

114.    Upon information and belief, at least as early 1998, Merrill Lynch began developing a second deposit sweep service. Merrill Lynch offered this second service, known internally at Merrill Lynch as the Cash Management Account 2.0 ("2000 CMA 2.0 Service"), to its brokerage customers at least as early as 2000.

## Regulatory Background

115.    The structure and operation of a deposit sweep service must comply with various banking statutes and regulations, as well as guidance from relevant federal agencies.

116.    Under a regulation promulgated by the Federal Reserve Board in 1980, an MMDA depositor "is permitted or authorized to make no more than six transfers and withdrawals, or a combination of such transfers and withdrawals, per calendar month or statement cycle (or similar period) of at least four weeks, to another account (including a transaction account) of the depositor at the same institution or to a third party by means of a preauthorized or automatic transfer, or telephonic (including data transmission) agreement, order or instruction, and no more than three of the six such transfers may be made by check, draft, debit card, or similar order made by the depositor and payable to third parties."  12 C.F.R. § 204.2(d)(2) (hereinafter, "Regulation D").

117.    Regulation D contains an exception to this general monthly limit for any "transfers or withdrawals [that] are made by mail, messenger, automated teller machine, or in person or when such withdrawals are made by telephone (via check mailed to the depositor) regardless of the number of such transfers or withdrawals."

118.    The Federal Reserve Board has provided guidance on whether certain deposit sweep services comply with Regulation D.  In an interpretive letter dated June 22, 1983, the Federal Reserve Board concluded that, under Regulation D, a broker-dealer cannot establish MMDAs, in its own name, and utilize a messenger to make withdrawals from the MMDAs on behalf of the broker-dealer's customers, in order to offer those customers unlimited checking or debit card transactions.  In a letter dated June 22, 1988, the Federal Reserve Board reaffirmed that these types of deposit sweep services violate Regulation D ("Federal Reserve Board Letter").

### The Parties' Competing Deposit Sweep Services

119.    Promontory began providing processing services to broker-dealers to support deposit sweep arrangements in 2006.  Promontory offers such services under the service marks Insured Network Deposits and IND® (hereinafter, all versions collectively referred to as "IND").

120.    Promontory has carefully designed IND to comply with applicable laws, regulations and regulatory guidance, and Promontory promotes and markets the service by reference to such compliance.  IND does not make withdrawals or transfers from MMDAs established through IND using any of the five methods that allow for unlimited monthly withdrawals or transfers from an MMDA under Regulation D.

121.    At present, IND supports numerous broker-dealers in sweeping cash from brokerage accounts into deposit accounts.  By sweeping funds into multiple banks, the IND service permits broker-dealers to offer each of their eligible customers access to additional FDIC insurance.

122.    The Reserve has offered a service to broker-dealers under the service mark Reserve Insured Deposits®.  Upon information and belief, the Reserve began offering this service to the public as early as 1997.  The Reserve Insured Deposits service directly has competed with Promontory's IND service.

123.    Upon information and belief, the Reserve has assisted broker-dealers in establishing MMDAs at banking institutions to hold funds swept from brokerage accounts through the Reserve Insured Deposits service.  Upon information and belief, at all relevant times, and in violation of Regulation D, the Reserve has employed messengers to withdraw or transfer funds from the MMDAs and to provide broker-dealer customers with unlimited withdrawals from their brokerage account, including withdrawals by check or debit card.

## The Reserve Patents and Related Applications

124.   In late 1998, the Reserve began to file United States patent applications relating to certain aspects of deposit sweep services.

125.   On or about October 21, 1998, the Reserve filed U.S. Patent Application No. 09/176,340. This application issued as the '231 patent on or about April 16, 2002. The Reserve had alleged that it owned the '231 patent until the transfer of all its rights to the '231 patent to its wholly-owned subsidiary, Island IP, in December 2008. Island IP has alleged that it owns the '231 patent.

126.   Upon information and belief, on or about April 11, 2003, the Reserve filed U.S. Patent Application No. 10/411,650 ("the '650 application") as a continuation-in-part of the '231 patent. The '650 application was unpublished by the PTO. The Reserve had alleged that it owned the '650 application until the transfer of all its rights to the '650 patent application to its wholly-owned subsidiary, Island IP, in December 2008.

127.   The '650 application issued as the '286 patent on or about March 24, 2009. Upon information and belief, Island IP alleges that it owns the '286 patent.

128.   Upon information and belief, on or about February 8, 2002, the Reserve filed U.S. Patent Application No. 10/071,053 ("the '053 application") as a continuation-in-part of the '231 patent. The Reserve had alleged that it owned the '053 application until the transfer of all its rights to the '053 patent application to its wholly-owned subsidiary, Island IP, in December 2008.

129.   The '053 application issued as the '551 patent on or about April 14, 2009. Upon information and belief, Island IP alleges that it owns the '551 patent.

130.   Upon information and belief, on or about March 6, 2003, the Reserve filed U.S. Patent Application No. 10/382,946 ("the '946 application") as a continuation-in-part of the '053

application. The Reserve had alleged that it owned the '946 application until the transfer of all its rights to the '946 patent application to its wholly-owned subsidiary, Island IP, in December 2008.

131.   The '946 application issued as the '350 patent on or about May 19, 2009. Upon information and belief, Island IP alleges that it owns the '350 patent.

132.   Upon information and belief, the Reserve has filed several other U.S. patent applications that are related to the Reserve Patents, including U.S. Patent Applications Nos. 09/677,535; 10/305,439; 10/825,440; 11/149,278; 11/641,046; 11/689,247; 11/767,827; 11/767,837; 11/767,846; 11/767,856; 11/840,052; 11/840,060; 11/840,064; 11/932,762; 12/025,402; 12/271,705; 12/340,026, 12/408,507; 12/408,511, and 12/408,523 (collectively, "the Related Applications").

133.   The alleged "inventions" of the Reserve Patents and the Related Applications that have been published include variations on deposit sweep services. The alleged "invention" of the patents also concerns the use of the well-established legal principle that a depositor may obtain FDIC insurance above the limit imposed upon a single depositor at a single institution by placing funds in more than one insured account. Accordingly, the Reserve Patents and Related Applications do not disclose and claim inventions.

134.   The claimed methods and systems of the Reserve Patents and Related Applications are limited to making withdrawals and transfers from MMDAs and other insured deposit accounts to transaction accounts using one of the five specific methods identified in Regulation D -- namely, by mail, messenger, automated teller machine, by telephone (via check mailed to the depositor), or in person.

135.    The Reserve Patents and Related Applications require the use of one of these five methods for making withdrawals and transfers from insured deposit accounts in an attempt to provide transaction accounts (e.g., brokerage accounts) that are not subject to Regulation D's limits on the number of withdrawals or transfers that a customer may make from an MMDA in a month.  Specifically, each of the independent claims of the '551 patent calls for exceeding the transaction limits imposed by Regulation D.  Because the Federal Reserve Board has determined that this arrangement does not comply with Regulation D, practicing the claimed methods and systems of the Reserve Patents and Related Applications violates applicable banking laws and regulations, including Regulation D.

### The Reserve Parties' Failure to Disclose Information About Prior Deposit Sweep Services to the PTO

136.    Upon information and belief, when the Reserve filed its patent applications with the PTO, the Reserve knew about deposit sweep services offered and used years ago by other financial institutions that were the same or similar in material respects to the claimed methods and systems of the Reserve's patent applications.  These services include, without limitation, Merrill Lynch's Original 1983 CMA/ISA Service and 2000 CMA 2.0 Service.  In addition, upon information and belief, when the Reserve filed its patent applications with the PTO, the Reserve knew about printed publications describing methods and systems for deposit sweep services that were published more than one year before the Reserve filed any of its patent applications.

137.    Upon information and belief, during the prosecution of its patent applications before the PTO, the Reserve Parties failed to disclose or misrepresented information about these services, and the Reserve Parties failed to disclose, or made misrepresentations about, the printed publications describing deposit sweep services.

138.   In addition, when the Reserve filed its patent applications, it knew about its own Reserve Insured Deposits service, which it has asserted is covered by the claims of one or more of the Reserve Patents and Related Applications.  Upon information and belief, the Reserve sold, offered for sale, or publicly used one or more versions of the Reserve Insured Deposits service more than one year before the filing dates of each of its patent applications.

139.   The Reserve failed to disclose to the PTO material information about the Reserve Insured Deposits service during the prosecution of the application that led to the '231 patent.  Upon information and belief, the Reserve Parties also failed to disclose to the PTO, for several years during the pendency of the application that led to the '286 patent, and the '551 patent, material information about the Reserve Insured Deposits service.  The Reserve eventually disclosed information about the Reserve Insured Deposits service in connection with this application, but only after it received letters from Promontory reminding the Reserve of its obligation to disclose such information, and even then, its disclosure was inadequate and misleading.  Furthermore, while the Reserve belatedly disclosed information about the Reserve Insured Deposits service to the PTO, it denied selling, offering for sale, publicly using, and advertising the Reserve Insured Deposits service before October 21, 1997, when in fact a magazine publicly distributed in September 1997 contained an advertisement for the Reserve Insured Deposits service.  After Promontory brought this to the Reserve's attention, the Reserve was forced to amend its pending patent applications.

140.   More recently, the Reserve Parties continued the practice of failing to properly disclose prior art, and providing misleading statements to the PTO in the prosecution of the Reserve Patents and Related Applications.  Promontory notified the Reserve Parties, in a letter dated February 23, 2009, that the Reserve had failed to disclose to the PTO relevant prior art in