UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------X
ISLAND INTELLECTUAL PROPERTY LLC,       :
et al.,                                 :
                                        : 09 Civ. 2675 (VM)
                    Plaintiff(s),       :
                                        :      **ORDER**
    -  against  -                       :
                                        :
DEUTSCHE BANK AG, et al.,               :
                                        :
                    Defendant(s).       :
--------------------------------------X
**VICTOR MARRERO, United States District Judge.**

The Court hereby directs the Clerk of Court to enter the attached Special Master's Report and Recommended Decision on Defendant's Summary Judgment Motion of Invalidity under 35 U.S.C. § 101 in the public record of this action.


**SO ORDERED.**

Dated:    New York, New York
          21 December 2011

Victor Marrero
U.S.D.J.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 12/21/11

DON W. MARTENS, A Professional Corporation
2040 Main Street
Fourteenth Floor
Irvine, CA 92614
Phone: (949) 760-0404
Facsimile: (949) 760-9502

Special Master

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ISLAND INTELLECTUAL PROPERTY LLC, LIDS CAPITAL LLC, DOUBLE ROCK CORPORATION, and INTRASWEEP LLC, | Civil Action No. 1:09-CV-02675 (VM) |
| Plaintiffs, | ECF Case |
| v. | |
| DEUTSCHE BANK TRUST COMPANY AMERICAS, and TOTAL BANK SOLUTIONS, LLC | **SPECIAL MASTER'S REPORT AND RECOMMENDED DECISION ON DEFENDANTS' SUMMARY JUDGMENT MOTION OF INVALIDITY UNDER 35 U.S.C. § 101** |
| Defendants. | |

1

# TABLE OF CONTENTS

2
Page No.

3

4   I.     INTRODUCTION ......................................................................................... 1

5   II.    THE TECHNOLOGY .................................................................................. 1

6   III.   LAW APPLICABLE TO SUMMARY JUDGMENT ................................... 4

7   IV.    ANALYSIS................................................................................................... 5

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page No(s).**

*Anderson v. Liberty Lobby, Inc.,*
 477 U.S. 242 (1986)...........................................................................................4, 5

*Avia Group Int'l, v. L.A. Gear Cal., Inc.,*
 853 F.2d 1557 (Fed. Cir. 1988) ........................................................................4, 5

*Bilski v. Kappos,*
 130 S. Ct. 3218 (2010)......................................................................................passim

*Celotex Corp., v. Catrett,*
 477 U.S. 317 ...........................................................................................................5

*Classen Innunotherapies, Inc. v. Biogen IDEC*
 659 F.3d 1057 ..................................................................................................11, 14

*CyberSource Corp. v. Retail Decisions, Inc.*
 654 F.3d 1366 (Fed. Cir. 2011) ......................................................................passim

*Diamond v. Diehr,*
 450 U.S. 175 (1981) ("*Diehr*") ...........................................................6, 7, 8, 11

*Gottschalk v. Benson,*
 409 U.S. 63 (1972) ("*Benson*").......................................................................6, 7

*Impax Labs. Inc. v. Aventis Pharm., Inc.,*
 545 F. 3d. 1312 (Fed. Cir. 2008) .........................................................................10

*In re Alappat,*
 33 F.3d 1526 (Fed. Cir. 1994) .............................................................................10

*In re Bilski,*
 345 F. 3d ..................................................................................................................9

*In re Bilski,*
 545 F. 3d 943 (Fed. Cir. 2008) ...............................................................................8

*Mark I Marketing Corp. v. R.R. Donnelly & Sons Co.,*
 55 F.3d 285 ..............................................................................................................4

*Parker v. Flook,*
 437 U.S. 584 (1978) ("*Flook*") .......................................................................6, 7

*Research Corp. Technologies v. Microsoft Corp.,*
 637 F.3d 859 ................................................................................................11, 13, 14

-ii-

**TABLE OF AUTHORITIES**
*(cont'd)*

Page No(s).

*Ultramercial, LLC v. Hulu, LLC,*
  657 F. 3d 1323 (Fed. Cir. 2011) ................................................................................passim

**OTHER AUTHORITIES**

12 C.F.R. § 204.........................................................................................................................2, 3

12 C.F.R. § 329...............................................................................................................................3

35 U.S.C. § 100..............................................................................................................................5

35 U.S.C. § 101.....................................................................................................................passim

35 U.S.C. § 238..............................................................................................................................9

Fed. R. Civ. P. 56.......................................................................................................................4, 5

Order Appointing Special Master, July 28, 2010 Doc. No.130...................................................1

-iii-

# I. <u>INTRODUCTION</u>

Island Intellectual Property LLC ("Island IP"), Lids Capital LLC, Double Rock Corporation and Intrasweep, LLC (collectively "the Plaintiffs") filed this consolidated action against Deutsche Bank Trust Company Americas ("Deutsche Bank") and Total Bank Solutions LLC ("TBS") (collectively "the Defendants") claiming infringement of seven United States patents by Defendants. I understand that U.S. Patents Nos. 7,536,350 and 7,668,771 have been withdrawn by Plaintiffs leaving the following five patents and claims asserted.

      Patent Number 7,509,286 ("the '286 Patent"), (Ex. 2) Claims 1, 2, 7 and 15;

      Patent Number 7,519,551 ("the '551 Patent") (Ex. 3) (Claims 18 and 27);

      Patent Number 7,668,772 ("the '772 Patent"), (Ex. 4) Claims 1 and 12;

      Patent Number 7,672,886 ("the '886 Patent), (Ex. 5) Claims 1 and 11; and

      Patent Number 7,680,734 ("the '734 Patent), (Ex. 6) Claims 1 and 8;

      (collectively referred to as "the Patents-in-Suit"); (Ex. 7, Dkt. No. 182, 09/19/2011).

      All of the five Patents-in-Suit are related and in the same family.

The Defendants have filed a Motion for Summary Judgment of Invalidity Under 35 U.S.C. § 101 of all asserted claims of the Patents-in-Suit.

The motion has been referred by this court to me as Special Master for recommended decision. Order Appointing Special Master, July 28, 2010 Doc. No.130; Order referring this motion to Special Master, September 7, 2011 Dkt. No. 180. The motions have been fully briefed by the parties and a hearing was held on November 30, 2011. At the hearing, oral argument was presented by counsel for both parties. I have reviewed and considered all of the arguments, evidence and other submissions of the parties and provide the following report and recommended decisions.

# II. <u>THE TECHNOLOGY</u>

The systems and methods claimed in the Patents-in-Suit all relate to deposit-sweep-services that enable financial institutions, such as banks and broker dealers ("source banks"), to "sweep" funds of their "clients'" (e.g., individual depositors') out of their banks or broker

-1-

1   dealer accounts into different accounts at multiple deposit-taking banks ("program banks" or
2   "deposit banks") that earn interest and provide FDIC-insurance. Because the FDIC usually
3   limits insurance coverage to the owners of the funds deposited in each FDIC-insured financial
4   institution to a certain amount (currently set at $250,000), sweeping client funds into accounts
5   at multiple program banks can result in providing clients with extended FDIC-insurance.
6   More specifically, clients' funds that substantially exceed the FDIC limit can all be insured
7   up to a relatively high limit because the funds are divided up among multiple accounts of
8   different program banks. Each client's funds are aggregated with those of other clients into at
9   least one aggregated account at each program bank. A portion of the money (some amount
10  less than the FDIC limit) of each of many different clients in the program is deposited into an
11  aggregated account.

12      The Patents-In-Suit provide computer implemented methods and computer systems
13  for managing the accounts of funds by providing extended FDIC-insurance for money swept
14  into interest-earning deposit accounts. Broadly, these patents relate to:

15      (a)   offering clients multiple tiers of interest rates on their deposits and applying a
16            tier to each other based on certain client criteria (the '286 and '772 Patents);
17            and

18      (b)   purportedly avoiding violation of federal banking regulations, including
19            Regulation D of the Federal Reserve Board regulations, 12 C.F.R. §
20            204.2(d)(2), which prohibits more than six electronic (among other methods)
21            withdrawals per period (e.g., month) from a single interest-bearing account at
22            a bank (the '551, '734, and '886 Patents).
23

24      As taught by the Patents-in-Suit, the entities involved in the program typically
25  include:

26      (1)   one or more source institutions ("source banks");
27      (2)   one or more recipient institutions ("program banks");
28   / / /

-2-

(3)    one or more intermediary institutions ("agents"; and

(4)    one or more clients or customers.

Source banks are the financial entities which have relationships with clients who open "client accounts" with the source banks. Source banks may be banks, broker dealers or other investment advisors or savings institutions.

Program banks are typically banks which hold client funds in an aggregated deposit account (such as an omnibus or pooled Money Market Deposit Account, "MMDA").

When funds originating from different client accounts are held together in the same aggregated deposit account, FDIC insurance may be available for each client up to the FDIC limit based on the respective "ownership interest" or "OI" of the various clients' funds held in such an account, even though the aggregated account value exceeds the FDIC insurance limit. When an aggregated deposit account is an MMDA, it is an interest-bearing account and is subject to certain restrictions under Federal Regulations (*see, e.g.*, 12 C.F.R. §§ 204.2(d)(1) 329.1(b)(3)) including the number of withdrawals that can be made in a statement period (*e.g.*, 6 or fewer withdrawals by certain methods during 1 month).

In between the source bank and a program bank may be one or more intermediary institutions, which manage the processes by performing the record keeping function that determines which client funds should be maintained in which program bank. As part of this record keeping function, an intermediary institution or agent may also determine from which program bank funds should be withdrawn and/or the method of withdrawing funds (*e.g.*, whether by messenger or wire transfer) so as to maintain the interest-bearing status. An intermediary institution may also calculate the interest to be paid to each OI in each aggregated deposit account.

An intermediary institution may also be used to facilitate the transfer of funds to and from the source bank and the program bank. Typically these types of programs use an omnibus or pooled demand deposit account as a clearance account (or settlement account) to facilitate such a transfer.

/ / /

-3-

1    The Patents-in-Suit also recognize that a single entity may play one or more of the
2    above roles in different permutations of a deposit sweep process. Conversely, the same role
3    may be played by multiple entities. For example, the intermediary institution may include a
4    separate intermediary bank, as well as a record keeping entity. Similarly, check and debit
5    card processing may be done by the source bank or the intermediary institutions.

6    In a typical deposit sweep process, data is exchanged between the source bank and the
7    intermediary institution on a daily basis in the form of a "sweep file." Typically, the
8    intermediary institution, which acts as the record keeper, analyzes the sweep files to
9    determine how much of each OI should be allocated to each program bank, and determine the
10   net transfer activity for the day to/from the source institution and to/from each program bank.

11   ## III. LAW APPLICABLE TO SUMMARY JUDGMENT

12   Summary judgment is appropriate when the record shows no genuine issue of material
13   fact, and an entitlement to judgment as a matter of law for the moving party. *See* Fed. R. Civ.
14   P. 56(c). A material fact is one that is relevant and necessary to the proceedings. *See*
15   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine issue exists if
16   sufficient evidence is presented so that a reasonable fact finder could decide the issue in the
17   nonmoving party's favor. *Id.* However, an asserted issue of material fact is not "genuine" in
18   the sense of Fed. R. Civ. P. 56 if a reasonable jury could only resolve the question for the
19   moving party. *See id.* at 248. The evidence proffered by the nonmoving party "is to be
20   believed, and all justifiable inferences are to be drawn in [the nonmovant's] favor." *Id.* at
21   255. When ruling on a motion for summary judgment, the court must keep in mind the proof
22   necessary to support liability or a defense under the applicable substantive law. *Id.* at 254.

23   The Federal Circuit has emphasized repeatedly that "summary judgment is as
24   appropriate in a patent case as any other case." *See, e.g., Avia Group Int'l, v. L.A. Gear Cal.,*
25   *Inc.*, 853 F.2d 1557, 1561 (Fed. Cir. 1988); *Mark I Marketing Corp. v. R.R. Donnelly & Sons*
26   *Co.*, 55 F.3d 285, 289 (Fed. Cir. 1995. Patent-eligibility under 35 U.S.C. § 101 is an issue of
27   law which is appropriate for summary judgment. *CyberSource Corp. v. Retail Decisions, Inc.*
28   654 F.3d 1366, 1369 (Fed. Cir. 2011).

-4-

1       A moving party on a motion for summary judgment "bears the initial responsibility of

2   informing the district court of the basis for its motion, and identifying those portions of 'the

3   pleadings, depositions, answers to interrogatories, and admission on file, together with the

4   affidavits, if any,' which it believes demonstrate the absence of genuine issue of material

5   fact." *Celotex Corp., v. Catrett*, 477 U.S. 317, 323 (quoting Fed. R. Civ. P. 56(c)). The

6   moving party's burden, however, is not to "produce evidence showing the absence of a

7   genuine issue of material fact." *Id.* at 325. Instead, the moving party needs only to

8   demonstrate that "there is an absence of evidence to support the nonmoving party's case." *Id.*

9       Although the evidence must be viewed in a light most favorable to a nonmovant, "a

10  nonmovant must do more than merely raise some doubts as to the existence of a fact;

11  evidence must be forthcoming from the nonmovant which would be sufficient to require

12  submission to the jury of the dispute over the fact." *Avia Group Int'l, Inc. v. L.A. Gear Cap.,*

13  *Inc.*, 853 F. 2d 1557, 1560 (Fed. Cir. 1988); see also *Anderson*, 477 U.S. at 249-50.

14                                  **IV. ANALYSIS**

15      Defendants' motion is based on the contention that all of the asserted claims are

16  directed to abstract ideas and as such are not patent-eligible under Supreme Court case law as

17  recently construed by the Court of Appeals for the Federal Circuit in *CyberSource*.

18      35 U.S.C. § 101 specifies the categories of subject matter eligible for patent

19  protection:

20              "Whoever invents or discovers any new and useful *process,*

21              *machine,* manufacture or composition of matter, or any new and

22              useful improvement thereof, may obtain a patent therefore, subject

23              to the conditions and requirements of this title" (emphasis added).

24      Many of the asserted claims are drawn to a "method." The "process" category of

25  Section 101 is statutorily defined to include methods. 35 U.S.C. § 100(b). The remainder of

26  the asserted claims are drawn to a computer implemented method ('559, Claims 18 and 27) or

27  a "computer system." A "computer implemented method" is a process. A "computer

28  / / /

                                        -5-

1    system" is a "machine." Thus, all asserted claims fit within either the "process" or the

2    "machine" category of Section 101.

3        The Supreme Court has recognized that Section 101 is merely a threshold test.

4    Inventions which pass through the threshold must still satisfy the detailed and comprehensive

5    requirements of novelty (Section 102), non-obviousness (Section 103) and definiteness

6    (Section 112). *Bilski v. Kappos*, 130 S. Ct. 3218, 3225 (2010).     Section 101 eligibility

7    should not become a substitute for a patentability analysis related to prior art or adequate

8    disclosure.

9        In *Bilski*, the Supreme Court explained that  the path through the Section 101

10    threshold is wide:

11            "[i]n choosing such expansive terms (in Section 101) modified by

12            the comprehensive "any" Congress plainly contemplated that the

13            patent law would be given wide scope." *Id.*

14    The methods claimed here are of a type commonly referred to as "methods of doing

15    business." In *Bilski*, the court refused to deem business methods categorically ineligible for

16    patent protection and cautioned against "read[ing] into the patent laws limitations and

17    conditions which the legislature has not expressed." *Id.* at 3226.

18        However, case law has established three categories of subject matter outside the

19    eligibility bounds of § 101 – laws of nature, physical phenomena and abstract ideas. *Bilski*,

20    130 S. Ct. at 3225. Defendants here contend that the asserted claims are mere abstract ideas.

21        In *Bilski* the Supreme Court chose not to define "abstract ideas." Instead, the Court

22    looked to the guideposts in its prior cases *Gottschalk v. Benson*, 409 U.S. 63 (1972)

23    ("*Benson*"); *Parker v. Flook*, 437 U.S. 584 (1978) ("*Flook*"); and *Diamond v. Diehr*, 450

24    U.S. 175 (1981) ("*Diehr*") and resolved the *Bilski* case "narrowly" on the basis of those

25    guideposts. *Bilski*, 130 S. Ct. at 3229. Thus, the court here must look to the guideposts of

26    *Benson*, *Flook* and *Diehr*.

27        *Benson* claimed a method of programming a general purpose computer to solve a

28    mathematical problem (an "algorithm") to convert binary-coded decimal numbers to pure

-6-

1  binary form. The claims were not limited to any particular art or technology, to any particular
2  machinery, or to any particular end use. The Supreme Court found that the claim was so
3  abstract and sweeping that the patent would wholly pre-empt the mathematical formula itself.
4  The Court held the claims to be directed to an abstract idea which is not eligible for patenting.
5    *Flook* also claimed a mathematical formula. *Flook* disclosed and claimed a particular
6  application for the formula—calculating an updated alarm limit for a catalytic conversion
7  process. The only difference between the conventional methods of changing alarm limits and
8  that of the patent application was the mathematical formula used. The Court found the claim
9  to be directed to an abstract idea. The Supreme Court in *Bilski* summarized the *Flook* ruling:

10      "*Flook* stands for the proposition that the prohibition against
11      patenting abstract ideas cannot be circumvented by attempting to
12      limit the use of the formula to a particular technological
13      environment or adding insignificant postsolution activity." See
14      *Bilski*, 130 S. Ct. at 3230 (internal quotations omitted.).

15    The asserted claims here are not directed merely to an abstract idea "limited to a
16  particular technological environment," or with the addition of "insignificant postsolution
17  activity," as in *Flook*. As will be discussed in more detail below, the asserted claims are
18  directed to improving existing technology. Computers here are disclosed and claimed as a
19  significant part of the invention, not as "insignificant postsolution activity."

20    *Diehr* claimed a previously unknown method for molding raw, uncured rubber into
21  cured precision products, using a mathematical formula to complete some of its several steps
22  by way of a computer. *Diehr* emphasized the need to consider the invention as a whole, rather
23  than dissecting the claims into old and new elements and then ignoring the presence of the old
24  elements in the analysis, particularly in a process claim. *Diehr*, 450 U.S. at 188. This
25  clarified or corrected some seemingly inconsistent language in *Flook*.

26    Noting that a mathematical algorithm alone is unpatentable under *Benson*, the *Diehr*
27  Court nevertheless held that the claimed process was patent-eligible subject matter, stating:
28  / / /

-7-

1  [The inventors] do not seek to patent a mathematical formula.

2  Instead, they seek patent protection for a process of curing

3  synthetic rubber.  Their process admittedly employs a well-known

4  mathematical equation, but they do not seek to pre-empt the use of

5  that equation.  Rather, they seek only to foreclose from others the

6  use of that equation in conjunction with all of the other steps in

7  their claimed process.  450 U.S. at 187.

8  The Court in *Diehr* thus drew a distinction between those claims that "seek to pre-

9  empt the use" of a mathematical algorithm, on the one hand, and claims that seek only to

10 foreclose others from using a particular "application" of that algorithm, on the other.

11 The asserted claims do not pre-empt the use of any mathematical algorithm.  Of

12 course the asserted claims use well known arithmetic in performing some steps of the claimed

13 money management methods and systems.  However, as in *Diehr*, the claims do not pre-empt

14 the use of that arithmetic, except in conjunction with all of the other steps in the claims.

15 The recent *Bilski* case involved a method for hedging against risk in the field of

16 commodities trading.  The Federal Circuit, sitting *en banc*, had adopted the machine-or-

17 transformation ("MOT") test as the **sole** test for patent eligibility of processes under Section

18 101; i.e. an invention is a "process" only if (i) it is tied to a particular machine or apparatus or

19 (ii) it transforms a particular article into a different state or thing.  Because the claimed

20 hedging method satisfied neither arm of the MOT test, the Federal Circuit found it was not

21 patent eligible under Section 101.  *In re Bilski*, 545 F. 3d 943, 956 (Fed. Cir. 2008).

22 The Supreme Court agreed that the *Bilski* claims did not pass the MOT test.

23 However, the Court found that the MOT test is not the sole test for patent-eligibility of

24 a process under Section 101, although it is a useful and important clue or investigative

25 tool in determining whether some claims are processes under § 101.  *Bilski*, 130 S. Ct.

26 at 3227.  The Court affirmed the Federal Circuit's holding that the *Bilski* claims were

27 abstract ideas, and thus not patent-eligible:

28 / / /

-8-

1    "Hedging is a fundamental economic practice long prevalent in our system of
2    commerce... Allowing petitioners to patent risk hedging would preempt use of the approach
3    in all fields, and would effectively grant a monopoly over an abstract idea." *Id.* 130 S. Ct. at
4    3231.

5    The asserted claims here do not pre-empt a fundamental known practice. While the
6    asserted claims apply a tiered interest rate to each customer (the '551, '734, and '886 Patents)
7    and purport to avoid violation of certain federal banking regulations (the '551, '734 and '886
8    Patents) they claim particular methods and systems for doing so and are claimed as
9    improvements over prior art computer methods and systems. The claims were found by the
10    Patent and Trademark Office ("PTO") to be novel. As the patents are presumed to be valid
11    (35 U.S.C. §282), the prior art methods and systems for calculating tiered interest rates and
12    complying with Regulation D presumptively are not pre-empted by the asserted claims. Nor
13    are future methods or systems for managing funds pre-empted unless they practice all of the
14    specific steps of at least one of the asserted claims, or their equivalents.

15    Moreover, unlike the *Bilski* claims, the asserted claims here are tied to a particular
16    machine and thus satisfy the "machine or transformation" test as enunciated by the Federal
17    Circuit. *In re Bilski*, 345 F. 3d at 956. (The asserted claims are copied in Attachment A
18    hereto).

19    Each of the five patents-in-suit describes and claims the methods and systems as
20    carried out by computers. Defendants use computers to carry out the accused methods.
21    Defendants' expert recognized that "computers and electronic databases have been utilized in
22    the banking industry for decades in order to process transactions and maintain client records."
23    Ex. C to Expert Report of Richard T. Powers considering validity. Page 51. "[C]laim 1 (of
24    the '886 patent) also requires computers that administer [ ] clients' deposits/transfer to and
25    withdrawals/transfers from each of the client transaction accounts..." Rebuttal Expert Report
26    of Ken Johnson at pp 14-15.

27    In the examination by the PTO of the application which issued at the '286 patent. The
28    examiner requested applicant to indicate in the record that "electronically" in the claims

1  means that a computer processor is performing the step, in order to avoid Section 101 issues.

2  The applicant complied (Ex. 9, 05/09/2008 Amd. in the '286 File History at p.19), and the

3  claims were allowed.    Proving invalidity is more difficult when the patent examiner

4  considered the asserted basis during patent prosecution.  *Impax Labs. Inc. v. Aventis Pharm..*

5  *Inc.*, 545 F. 3d. 1312, 1314 (Fed. Cir. 2008).

6          While some of the individual  claimed steps theoretically could be performed by the

7  human mind, the claims as a whole repeatedly refer to the use of computers, electronic

8  databases, and/or electronically performing various functions.  Various one of the asserted

9  claims require interaction between the agent, the source banks and the program banks, such as

10  transferring funds between banks and posting interest rates to be credited to each client

11  account. The asserted claims are expressly limited to use of computers.  There is no evidence

12  that it would be practical to practice the invention here without the use of computers.

13          Defendants contend that a programmed general purpose computer is not a "particular"

14  machine, as required by the MOT test. To the contrary, in the *en banc* case of *In re Alappat,*

15  33 F.3d 1526, 1545 (Fed. Cir. 1994). The Federal Circuit observed that:

16                  "programming creates a new machine, because a general purpose

17                  computer in effect becomes a special purpose computer once it is

18                  programmed to perform particular functions pursuant to

19                  instructions from program software."

20          As the court noted in *Ultramercial, LLC v. Hulu. LLC,* 657 F. 3d 1323, 1329 (Fed.

21  Cir. 2011):

22                  "In other words, a programmed computer contains circuitry unique

23                  to that computer. That "new machine" could be claimed in terms

24                  of a complex array of hardware circuits, or more efficiently, in

25                  terms of the programming that  facilitates a unique function.  The

26                  digital computer may be considered by some the greatest invention

27                  of the twentieth century, and both this court and the Patent Office

28                  have long acknowledged that "improvements thereof" through

                                          -10-

1                inter-changeable software or hardware enhancements deserve

2                patent protection. Far from abstract, advances in computer

3                technology—both hardware and software—drive innovation in

4                every area of specific and technical endeavor."

5         Thus, unlike the claims in *Bilski*, the asserted claims do satisfy the MOT test. While

6 not the sole test, it is "a useful and important clue or investigative tool" for determining

7 patent eligibility under Section 101. *Bilski*, 130 S. Ct at 3227.

8         Defendants disregard the computer elements of the claims in their analysis. However,

9 in determining eligibility for patent under Section 101, the "claims must be considered as a

10 whole. It is inappropriate to dissect the claims into old and new elements and then to ignore

11 the presence of the old elements in the analysis." *Diehr*, 450 U.S. at 188.

12         After the Supreme Court in *Bilski* refused to define an "abstract idea," the Federal

13 Circuit has repeatedly noted it also would:

14                "not presume to define 'abstract' beyond the recognition that this

15                disqualifying characteristic should exhibit itself so manifestly as to

16                override the broad statutory categories of eligible subject matter

17                and the statutory context that directs primary attention on the

18                patentability criteria of the rest of the Patent Act."

19 *Research Corp. Technologies v. Microsoft Corp.*, 637 F.3d 859, 868; *Classen*

20 *Innunotherapies, Inc. v. Biogen IDEC* 659 F.3d 1057, 1065 (Fed. Cir. 2011; *Ultramercial*,

21 657 F. 3d at 1327.

22         Defendants rely on the recent *CyberSource* case for their "abstract idea" defense.

23 *CyberSource Corp. v. Retail Decisions*, 654 F. 3d 1366 (Fed. Cir. 2011).

24         In *CyberSource* the court first considered Claim 3 of the patent which claimed:

25             3.     A method for verifying the validity of a credit card transaction over

26                the Internet comprising the steps of:

27 ///

28 ///

-11-

1       a) obtaining information about, other transactions that have utilized an

2            Internet address that is identified with the [ ] credit card

3            transactions;

4       b) constructing a map of credit card numbers based upon the other

5            transactions and;

6       c) utilizing the map of credit card numbers to determine if the credit

7            card transaction is valid.

8       The court concluded that the claim merely required gathering information, analyzing

9 that information and determining whether the credit card transaction is valid. The claimed

10 method did not require any action based upon that determination or even any communication

11 or use of the determination. No machine was recited as performing the claimed steps. The

12 court found that the claimed method could literally be performed in its entirety in the human

13 mind without the use of any machine. The court thus held that Claim 3 was "drawn to an

14 unpatentable mental process—a subcategory of unpatentable abstract ideas." *Id.* at 1371.

15 Unlike *CyberSource* Claim 3, none of the asserted claims recite only mental steps. Each of

16 the claims literally and substantively requires use of computers.

17       *CyberSource* Claim 2 was directed to "computer readable medium" such as a disk,

18 hard drive or other data storage device, capable of programming a computer to carry out the

19 mental steps of Claim 3. *See* Appendix C hereto for a copy of Claim 2. Claim 2 did not

20 claim the computer itself. The court found that Claim 2 recited nothing more than a computer

21 readable medium containing program instructions for executing the purely mental steps of

22 Claim 3. It was simply the abstract idea recorded on a storage medium.

23       CyberSource argued that Claim 2 satisfies the machine prong of the machine-or-

24 transformation test, since the recited computer readable medium contains software

25 instructions that can only be executed by one or more processors of a computer system. The

26 court stated:

27            "[T]o impart patent-eligibility to an otherwise unpatentable process

28            under the theory that the process is linked to a machine, the use of

1   the machine 'must impose meaningful limits on the claim's scope.'

2   In other words, the machine 'must play a significant part in

3   permitting the claimed method to be performed.' Here, the

4   incidental use of a computer to perform the mental process of

5   Claim 3 does not impose a sufficiently meaningful limit on the

6   claim's scope."

7 (citations omitted). *CyberSource,* 654 F. 3d at 1375.

8   The court noted that the *CyberSource* claims were entirely unlike cases where, as a

9 practical matter, the use of a computer is required to perform the claimed method." *Id.* at

10 1376.

11   The *CyberSource* court was not convinced that the computers "played a significant

12 part in permitting the claimed method to be performed." Here to the contrary, there are no

13 claims to pure mental steps with incidental recitation of a computer.  Computers here are

14 disclosed and claimed as significant parts of the claimed inventions. The computers here are

15 not merely "incidental" but instead "play a significant part in permitting the claimed method

16 to be performed."  Defendants have identified no evidence that, as a practical matter, the

17 disclosed and claimed computers could be eliminated. *See CyberSource,* 654 F. 3d. at 1376.

18   After the *CyberSource* decision, the Federal Circuit again considered an alleged

19 abstract idea in *Ultramercial.*  The patent claimed a method for monetizing copyrighted

20 products. The district court had granted a motion to dismiss for failure to claim patent-eligible

21 subject matter[1].  The Federal Circuit reversed and remanded.

22   Chief Judge Rader, writing for the court, noted that Section 101 is "broadly

23 permissive and is "no more than a coarse eligibility filter." *Ultramercial,* 657 F. 3d at 1325.

24 (citing *Research Corp.*). "Because technology is ever-changing and evolves in unforeseeable

25 ways, the court gives substantial weight to the statutory reluctance to list any new, non

26 ///

27

28  [1] Exemplary Claim 1 of the *Ultramercial* patent is copied in Attachment B hereto.

-13-

1  obvious, and fully disclosed subject matter as beyond the reach of title 35." *Id.* 657 F. 3d at

2  1327.

3      The court in *Ultramercial* noted that "The application of an abstract idea to a 'new

4  and useful end' is the type of invention that the Supreme Court...has described as deserving

5  of patent protection." *Id.* "Inventions with specific applications or improvements to

6  technologies in the marketplace are not likely to be so abstract that they override the statutory

7  language and framework of the Patent Act." *Research Corp.,* 627 F.3d at 869.

8      In *Ultramercial*, the Federal Circuit distinguished *CyberSource* where "the court

9  discerned that an invention claimed an unpatentable mental process." *Ultramercial,* 657 F.

10  3d at 1329. The court in *Ultramercial* noted that the eligibility exclusion for purely mental

11  steps is particularly narrow. Claims must be considered as a whole and "the presence of

12  mental steps in a claim does not detract from the patentability of other steps." *Id.* at 1329-30.

13      The court found that the *Ultramercial* patent does not simply claim the age-old idea

14  that advertising can serve as currency, but discloses and claims a practical application of this

15  idea. Similarly here the patents-in-suit disclose and claim practical methods for applying the

16  known principles that interest rates can be tiered and limits on FDIC insured accounts can be

17  avoided.

18      The court in *Ultramercial* further distinguished *CyberSource* on the ground that the

19  *Ultramercial* claims require "controlled interaction with a consumer via an Internet website,

20  something far removed from *purely* mental steps." *Id.* at 1330 (emphasis in original). Here

21  the claims require controlled interaction between the intermediate banks, the source banks

22  who deal with the customers, and the program banks which hold the aggregated accounts.

23  The claims variously define steps of posting interest amounts and transferring funds from one

24  bank to another, all done with the aid of computers.

25      On the claims before it, the court in *CyberSource* came to a different conclusion from

26  that in *Ultramercial, Research Corp.,* and *Classen.* However, each case must be considered

27  in the context of the claims before the court. Without any clear definition of "abstract ideas"

28  from either the Supreme Court or the Federal Circuit, the standard for determining patent-

1   eligibility is not a bright line test, but a matter of degree.  As the Federal Circuit said in

2   *Ultramercial*:

3                "Viewin g the subject matter as a whole, the invention involves an

4                extensive computer interface.  The court does not define the level

5                of  programming  complexity  required  before  a  computer-

6                implemented method can be patent-eligible.  Nor does this court

7                hold that use of an Internet website to practice such a method is

8                either necessary or sufficient in every case to satisfy § 101.  This

9                court simply find the claims here to be patent-eligible, in part

10               because of these factors." *Id.* at 1328.

11      The claims here are more similar to those in *Ultramercial* than to those in

12   *CyberSource*.

13      Chief Judge Rader noted in *Ultramercial*:  "By its terms, the claimed invention

14   purports to improve existing technology in the marketplace.  By its terms, the claimed

15   invention invokes computers and applications of computer technology." *Id.*  Accordingly, the

16   court found the claimed invention was not so "manifestly abstract" as to override the broad

17   statutory language of Section 101. *Id.* at 1330.

18      Similarly, here by their terms, the claimed inventions purport to improve existing

19   technology.  By their terms, the claimed inventions invoke computers and applications of

20   computer technology.  The inventions claimed here are not "manifestly abstract."  To the

21   contrary, they are disclosed and claimed as practical improvements on prior money

22   management technology.

23      Accordingly, it is recommended that Defendants' Motion for Summary Judgment be

24   denied.

25

26   ___12/19/11_____          _____Don W Martens_____
     Date                                Don W. Martens

27                                       Special Master

28   H:\DOCS\DWM\DWM-2979/ncm/gtv
     121911

                              -15-

## ATTACHMENT A TO SPECIAL MASTER'S REPORT

### Patent Number 7,509,286 ("the '286 Patent"), (Ex. 2) Claims 1, 2, 7 and 15

1. A method for managing funds of a plurality of respective client accounts associated with a plurality of respective clients participating in a program, comprising:

maintaining a plurality of FDIC-insured and interest-bearing aggregated deposit accounts, each of the aggregated deposit accounts being interest-bearing, with one or more of the aggregated deposit accounts held in each different one of a plurality of financial institutions in the program;

maintaining funds of a plurality of the clients in the plurality of aggregated deposit accounts so that each aggregated deposit account holds funds of a plurality of the clients, with each client account in a subset of the plurality of client accounts having funds in their respective client account over a predetermined amount, with each of the respective client accounts in the subset having funds deposited in a plurality of the aggregated deposit accounts;

maintaining or having maintained or accessing by computer an electronic database, on one or more computer-readable media, comprising a respective balance of funds for each of a plurality of the respective client accounts in the subset and information on funds held by each of the plurality of clients of the subset in the plurality of aggregated deposit accounts;

receiving electronic client transaction data describing debit and/or credit transactions made by a plurality of clients against their respective client accounts;

updating the respective balance of funds in the database associated with each of the respective client accounts in the subset based on one or more debit and/or credit transactions made by the respective client;

determining electronically for each of the plurality of the client accounts in the subset of client accounts a respective interest rate from among a plurality of interest rates in an interest-allocation procedure based at least in part on the updated balance of funds associated with the respective client account in the subset;

calculating electronically a respective interest for a period to be posted to each of a plurality of respective client accounts in the subset, with the respective interest to be posted to a respective client account determined based on the respective interest rate determined for that

respective client account in the subset, with the calculating being independent from the respective client account pro rata share in earnings posted to the plurality of the aggregated deposit accounts holding funds of the respective client account;

determining interest earned during the period by each of the plurality of aggregated deposit accounts in the program; and

posting electronically the respective interest calculated for each of the plurality of respective client accounts based on the respective interest rate determined for the respective client account.

2.  The method as defined in claim 1, wherein there are a plurality of different customer financial entities, each different customer financial entity having a plurality of customer accounts associated therewith, and further comprising:

determining the interest-allocation procedure for each of a plurality of respective client accounts based at least in part on the customer financial entity associated with the respective client account.

7.  The method of claim 1, wherein one or more of the clients are associated with at least one customer financial entity, wherein the steps of the method are performed by one or more computers operated on behalf of an agent entity managing the client accounts on behalf of the customer financial entity, and wherein the interest-allocation procedure is determined at least in part based on a parameter related to the customer financial entity.

15. A method for managing funds of a plurality of respective client accounts associated with a plurality of respective clients participating in a program, comprising:

maintaining a plurality of FDIC-insured and interest-bearing aggregated deposit accounts, each of the aggregated deposit accounts being interest-bearing, with one or more of the aggregated deposit accounts held in each different one of a plurality of financial institutions in the program;

maintaining funds of a plurality of the clients in the plurality of aggregated deposit accounts so that each aggregated deposit account holds funds of a plurality of the clients, with each client account in a subset of the plurality of client accounts having funds in their respective client account over a predetermined amount, with each of the respective client accounts in the subset having funds deposited in a plurality of the aggregated deposit accounts;

maintaining or having maintained or accessing by computer an electronic database, on one or more computer readable media, comprising a respective balance of funds for each of a plurality of the respective client accounts in the subset and information on funds held by each of the plurality of clients of the subset in the plurality of aggregated deposit accounts;

receiving electronic client transaction data describing debit and/or credit transactions made by a plurality of clients against their respective client accounts;

determining or having determined or receiving electronically for each client account with transaction activity a net client-account credit or net client-account debit resulting from that client's one or more transactions received in the client transaction data;

updating a respective balance of funds associated with each of a plurality of the respective clients based on the respective net client-account credit or respective net client-account debit determined from the respective client's transactions;

determining electronically for each of the plurality of the client accounts in the subset of client accounts a respective interest rate from among a plurality of interest rates in an interest-allocation procedure based at least in part on the updated balance of funds associated with the respective client account in the subset;

calculating electronically a respective interest for a period to be posted to each of a plurality of respective client accounts in the subset, with the respective interest to be posted to a respective client account determined based on the respective interest rate determined for that respective client account in the subset, with the calculating being independent from the respective client account pro rata share in earnings posted to the plurality of the aggregated deposit accounts holding funds of the respective client account;

determining interest earned during the period by each of the plurality of aggregated deposit accounts in the program; and

posting electronically the respective interest calculated for each of the plurality of respective client accounts based on the respective interest rate determined for the respective client account.

### Patent Number 7,519,551 ("the '551 Patent") (Ex. 3) (Claims 18 and 27)

18. A computer-implemented method for managing funds for a plurality of client accounts for a plurality of clients whose funds were accepted for deposit in respective client

accounts held in the names of the respective clients at a first banking institution that includes a first bank in its infrastructure, the method comprising:

(a) maintaining a plurality of FDIC-insured and interest-bearing aggregated deposit accounts, each aggregated deposit account held in a different respective bank of a different respective banking institution including an FDIC-insured and interest-bearing aggregated deposit account held at the first bank in the first banking institution;

(b) maintaining or having maintained an electronic database, on one or more computer-readable media, containing information on funds held by each client in the plurality of aggregated deposit accounts;

(c) administering the aggregated deposit accounts to transfer or have transferred client funds that had been accepted into respective client accounts held in the names of the respective clients at the first banking institution to the aggregated deposit account at the first bank except that for clients with a balance of funds in the aggregated deposit account at the first bank that equal or exceed a specified amount depositing or having deposited additional funds of that client to one of the aggregated deposit accounts in one of the different banks in one of the different banking institutions;

(d) withdrawing or having withdrawn client funds from the FDIC-insured and interest-bearing aggregated deposit account held at one of the banks of one of the banking institutions more than six (6) times during a month while preserving an insured and interest-bearing status of the FDIC-insured and interest-bearing aggregated deposit account held at the one bank; and

(e) updating or having updated the electronic database based on the transfers to and withdrawals in the plurality of aggregated deposit accounts.

27. A computer-implemented method for managing funds for a plurality of client accounts for a plurality of clients whose funds were accepted for deposit in respective client 45 accounts held in the names of the respective different clients at a first banking institution that includes a first bank in its infrastructure, the method comprising:

(a) accepting client funds from each of a plurality of the clients, with funds from each different client being accepted into a respective client account held in the name of that respective client at the first banking institution;

-4-

(b) maintaining or having maintained an FDIC-insured and interest-bearing aggregated deposit account at the first bank in the first banking institution;

(c) maintaining or having maintained or receiving access by computer to an electronic database, on one or more computer-readable media, containing information on funds held by each client in a plurality of FDIC-insured and interest-bearing aggregated deposit accounts, each aggregated deposit account held in a different respective bank of a different respective banking institution;

(d) transferring or have transferred client funds of a plurality of the client accounts to the aggregated deposit account at the first bank except that for clients with a balance of funds in the aggregated deposit account at the first bank that equal or exceed a specified amount depositing or having deposited additional funds of that client to one of the aggregated deposit accounts in one of the different banks in one of the different banking institutions;

(e) withdrawing or having withdrawn client funds from the aggregated deposit account held at one of the banks of one of the banking institutions more than six (6) times during a month while preserving an insured and interest-bearing status of the FDIC-insured and interest-bearing aggregated deposit account held at the one bank; and

(f) updating the electronic database based on the transfers to and withdrawals in the plurality of aggregated deposit accounts or receiving electronic access.

**Patent Number 7,668,772 ("the '772 Patent"), (Ex. 4) Claims 1 and 12**

1. A method for managing funds of a plurality of respective client transaction accounts in a bank, the respective client transaction accounts associated with a plurality of respective clients participating in a program, comprising:

(A) accessing one or more electronic databases, stored on one or more computer-readable media, comprising:

(i) aggregated account information for one or more Federal Deposit Insurance Corporation (FDIC)-insured and interest-bearing aggregated deposit accounts held in one or more banks in a program, wherein funds from client transaction accounts of a plurality of clients are held with funds of other client transaction accounts in the one or more aggregated deposit accounts held in the one or more banks in the pro-gram; and

(ii) client account information for each of the respective client transaction accounts comprising: (1) a respective balance in the respective client transaction account; (2) transaction data for the respective client transaction account; and (3) a respective balance of funds from the respective client transaction account held in each of the one or more insured and interest-bearing aggregated deposit accounts holding funds of the respective client transaction account; and

(B) receiving, by the one or more computers, electronic client transaction data describing debit and/or credit transactions made by a plurality of the respective clients against their respective client transaction accounts;

(C) updating, by the one or more computers, the respective balance of funds in the one or more electronic databases for each of a plurality of the respective client transaction accounts based on one or more debit and/or credit transactions made for the respective client transaction account;

(D) generating instructions to transfer funds to be held in at least one of the one or more aggregated deposit accounts based on the client transaction data or to withdraw funds from at least one of the one or more aggregated deposit accounts based on the client transaction data;

(E) determining, by the one or more computers, for each of the plurality of the client transaction accounts a respective interest rate from among at least three different interest rates based on one or more criteria so that different clients having funds in the one or more aggregated deposit accounts are accorded different interest rates;

(F) calculating, by the one or more computers, or having calculated by one or more computers, for each of one or more of the client transaction accounts determined to have a first interest rate of the at least three interest rates, a respective interest for funds of the respective client transaction account held in the one or more aggregated deposit accounts, for a period using the first interest rate, with the calculating being independent from the respective client transaction account pro rata share in earnings posted for the one or more aggregated deposit accounts holding funds of the respective client transaction account;

(G) calculating, by the one or more computers, or having calculated by one or more computers, for each of one or more of the client transaction accounts determined to have a second interest rate of the at least three interest rates, a respective interest for funds of the respective client transaction account held in the one or more aggregated deposit accounts, for the

period using the second interest rate, with the calculating being independent from the respective
client transaction account pro rata share in earnings posted for the one or more aggregated
deposit accounts holding funds of the respective client transaction account;

(H) determining, by the one or more computers, interest earned on funds held during
the period in each of the one or more aggregated deposit accounts in the program; and

(I) posting electronically the respective interest for each of a plurality of respective
client transaction accounts based on the respective interest rate determined for the funds of the
respective client transaction account held in the one or more aggregated deposit accounts.

12. The method as defined in claim 1, wherein there are a plurality of banks in the
program, each of the banks with at least one aggregated deposit account, and wherein the one or
more electronic databases maintain client account information comprising at least one client's
funds held in one or more aggregated deposit accounts in a plurality of said banks in the program.

### Patent Number 7,672,886 ("the '886 Patent), (Ex. 5) Claims 1 and 11

1. A computer system for managing a plurality of client transaction accounts
associated with a plurality of respective clients for a plurality of transactions, said system
comprising: one or more electronic databases, stored on one or more computer-readable media,
comprising:

(i) client account information for each of the respective client transaction
accounts;

(ii) aggregated transaction account information for a plurality of Federal
Deposit Insurance Corporation (FDIC)-insured and interest-bearing aggregated deposit accounts
held in a plurality of banks in a program, wherein funds from client transaction accounts of a
plurality of clients are aggregated with funds of other client transaction accounts in the
aggregated deposit accounts held in the banks in the program; and

(iii) information on each client's funds held in said plurality of the insured and
interest-bearing aggregated deposit accounts; and

one or more computers comprising memory wherein the memory stores computer-
readable instructions that, when executed, cause the one or more computers to perform the steps:

(a) administering clients' deposits/transfers to and withdrawals/transfers from each of
said client transaction accounts, said administering comprising processing transaction data

-7-

comprising data for one or more deposits/transfers for one or more client transaction accounts and transaction data for each of more than six (6) withdrawals/transfers to be paid to third parties by check and/or debit cards, within a month from each of a plurality of said client transaction accounts, with the transaction data comprising a respective amount for each respective withdrawal/transfer;

(b) determining on a regular basis, one or more net transactions for a plurality of clients' accounts for a plurality of said clients comprising a sum of said plurality of clients' deposits/transfers to and/or withdrawals/transfers from a plurality of said respective client transaction accounts;

(c) determining, based on one or more of said net transactions, whether to deposit/transfer funds to or withdraw/ transfer funds from said one or more FDIC-insured and interest-bearing aggregated deposit accounts, comprising:

(i)    determining whether each client's funds held in one of the banking institutions in the one or more FDIC-insured interest bearing aggregated deposit accounts held therein is more than a specified amount; and

(ii)   generating data for distribution of any amounts over said specified amount into at least one other FDIC-insured interest bearing aggregated deposit account at least one other of the banking institutions in which the total of said client's funds will not exceed the specified amount;

(d) processing, during the month, needed deposits/transfers to, or needed withdrawals/transfers from said one or more FDIC-insured and interest-bearing aggregated deposit accounts based on one or more of the net transactions, so that more than six (6) withdrawals/transfers are made during a month from at least one of said FDIC-insured and interest-bearing aggregated deposit accounts; and

(e) updating one or more of the electronic databases with each client's deposits/transfers to and withdrawals/ transfers from said each client's respective transaction account.

11. The system of claim 1, wherein one or more of the electronic databases includes client preference and/or exclusion information comprising a client's one or more preferences and/or one or more exclusions of one or more banks to hold its funds; and

wherein the computer-readable instructions stored in the memory determines the other bank in the program for distribution of the deposit/transfer, when the balance of funds for the respective client in the aggregated deposit account at the one banking institution equals or exceeds the specified amount, based at least in part on the client preference and/or exclusion information.

### Patent Number 7,680,734 ("the '734 Patent), (Ex. 6) Claims 1 and 8

1. A method for managing a plurality of client accounts for a plurality of clients, comprising:

accessing, by one or more computers, a database comprising information for each client account that has client account funds aggregated with funds of a plurality of other of the client accounts and are held in one or more FDIC-insured and interest-bearing aggregated deposit accounts held in one or more FDIC insured banking institutions, with the information for each of the client accounts including information on each client's funds held in said one or more insured and interest-bearing aggregated deposit accounts; and

administering, by the one or more computers, deposits to and withdrawals from each of a plurality of said client accounts, including more than six withdrawals in a month from each of a plurality of the client accounts, with one or more of said withdrawals made by debit card;

determining, by the one or more computers, on a regular basis one or more net transactions as sums of said deposits to and withdrawals from said client accounts;

determining, by the one or more computers, from said net transactions whether to deposit funds to or withdraw funds from said one or more FDIC-insured and interest-bearing aggregated deposit accounts;

making or having made more than six withdrawals in a month of funds from one of the FDIC-insured and interest-bearing aggregated deposit accounts via at least one intermediate bank that is different from the one or more FDIC insured banking institutions; and

updating, by the one or more computers, the database with deposits to and withdrawals from said each client account.

8. A method for managing a plurality of client accounts for a plurality of clients, comprising:

-9-

accessing, by one or more computers, a database comprising information for each client account that has client account funds aggregated with funds of a plurality of other of the client accounts and are held in one or more FDIC-insured and interest-bearing aggregated deposit accounts held in one or more FDIC-insured banking institutions, with the information for each of the client accounts including information on each client's funds held in said one or more insured and interest-bearing aggregated deposit accounts; and

administering, by the one or more computers, deposits to and withdrawals from each of a plurality of said client accounts, including more than six withdrawals in a month by check or debit card or ACH from each of a plurality of the client accounts, with one or more of said withdrawals made by debit card;

determining, by the one or more computers, on a regular basis one or more net transactions as sums of said deposits to and withdrawals from said client accounts;

determining, by the one or more computers, from said net transactions whether to deposit funds to or withdraw funds from said one or more FDIC-insured and interest-bearing aggregated deposit accounts;

making or having made more than six withdrawals in a month of funds from one of the FDIC-insured and interest-bearing aggregated deposit accounts via at least one intermediate bank that is different from the one or more FDIC insured banking institutions; and

updating, by the one or more computers, the database with deposits to and withdrawals from said each client account.

## ATTACHMENT B TO SPECIAL MASTER'S REPORT

### Patent Number 7,346,545 ("the '545 Patent"), Claim 1.

1. A method for distribution of products over the Internet via a facilitator, said method comprising of the steps of:

a first step of receiving, from a content provider, media products that are covered by intellectual-property rights protection and are available for purchase, wherein each said media product being comprised of at least one of text data, music data, and video data;

a second step of selecting a sponsor message to be associated with the media product, said sponsor message being selected from a plurality of sponsor messages, said second step including accessing an activity log to verify that the total number of times which the sponsor message has been previously presented is less than the number of transaction cycles contacted by the sponsor message;

a third step of providing the media product for sale at an Internet website;

a fourth step of restricting general public access to said media product;

a fifth step of offering to a consumer access to the media product without charge to the consumer on the precondition that the consumer views the sponsor message;

a sixth step of receiving from the consumer a request to view the sponsor message, wherein the consumer submits said request in response to being offered access to the media product;

a seventh step of, in response to receiving the request from the consumer, facilitating the display of a sponsor message to the consumer;

an eighth step of, if the sponsor message is not an interactive message, allowing said consumer access to said media product after said step of facilitating the display of said sponsor message;

a ninth step of, if the sponsor message is an interactive message, presenting at least one query to the consumer and allowing said consumer access to said media product after receiving a response to said at lease one query;

a tenth step of recording the transaction event to the activity log, said tenth step including updating the total number of times the sponsor message has been presented; and

an eleventh step of receiving payment from the sponsor of the sponsor message displayed.

## ATTACHMENT C TO SPECIAL MASTER'S REPORT

### Claims 2 and 3 of the *CyberSource* Patent

2. A computer readable medium containing program instructions for detecting fraud in a credit card transaction between a consumer and merchant over the Internet, wherein execution of the program instructions by one or more processors of a computer system causes the one or more processors to carry out the steps of:

a) obtaining credit card information relating to the transactions from the consumer; and

b) verifying the credit card information based upon values of plurality of parameters, in combination with information that identifies the consumer, and that may provide an indication whether the credit card transaction is fraudulent, wherein each value among the plurality of parameters is weighted in the verifying step according to an importance, as determined by the merchant, of that value to the credit card transaction, so as to provide the merchant with a quantifiable indication of whether the credit card transaction is fraudulent, wherein execution of the program instructions by one or more processors to carry out the further steps of:

[a] obtaining information about other transactions that have utilized an Internet address that, is identified with the credit card transaction; and

[b] constructing a map of credit card numbers based upon the other transactions;

[c] utilizing the map of credit card numbers to determine if the credit card transaction is valid.

3. A method for verifying the validity of a credit card transaction over the Internet comprising the steps of:

a) obtaining information about, other transactions that have utilized an Internet address that is identified with the [ ] credit card transaction;

-13-

b) constructing a map of credit card numbers based upon the other transactions and;

c) utilizing the map of credit card numbers to determine if the credit card transaction action is valid.

H:\DOCS\DWM\DWM-2980/aem
121911